Citation Nr: 1829325 
Decision Date: 05/25/18 Archive Date: 06/12/18

DOCKET NO. 11-00 946 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Waco, Texas


THE ISSUES

1. Entitlement to service connection for a bilateral eye condition.

2. Entitlement to service connection for a colon condition.

3. Entitlement to service connection for a urinary condition to include the residuals of prostate cancer.

4. Entitlement to service connection for erectile dysfunction (special monthly compensation (SMC) K).

5. Entitlement to service connection for a jaw injury with loss of teeth for VA compensation purposes.

6. Entitlement to a disability rating in excess of 10 percent for scrotal crural dermatitis residuals prior to July 14, 2017 and in excess of 60 percent thereafter.

7. Entitlement to a disability rating in excess of 30 percent for an acquired psychiatric disorder.



REPRESENTATION

Veteran represented by: Texas Veterans Commission


WITNESS AT HEARING ON APPEAL

Veteran and his spouse


ATTORNEY FOR THE BOARD

David R. Seaton, Associate Counsel


INTRODUCTION

The Veteran served on active duty from March 1966 to February 1968 and from April 1970 to November 1971. The period of service from April 1970 to November 1971 is considered dishonorable for VA purposes.
 
This matter comes to the Board of Veterans' Appeals (Board) on appeal from an August 2010 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Waco, Texas. 

These matters were previously before the Board, and, in November 2016, the Board remanded these matters for further development. Further development in substantial compliance with the Board's remand instructions has been completed.

The issue of entitlement to an increased disability rating for scrotal crural dermatitis is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The Veteran's preexisting vision problem of the left eye was not aggravated by a period of service; a medical nexus has not been established between a period of service any of the bilateral eye disorders that began to manifest after service; and the Veteran did not manifest a neurological eye disorder or any other chronic eye disorder within one year of separation from service or continuity of symptomology since separation of service.

2. The Veteran was exposed to herbicide agents during his service in the Republic of Vietnam during the Vietnam War, but he has not been diagnosed with prostate cancer and his prostatectomy was for a benign adenoma. The Veteran's urinary problems are not the result of a service connected disability. 

3. The Veteran's erectile dysfunction is proximately due to his service-connected acquired psychiatric disorder.

4. The Veteran does not have a dental disorder that was due to loss of substance of the mandible or maxilla.

5. A disability of the colon has not been shown to have been the result of either the Veteran's military service or a service connected disability.

6. The Veteran's acquired psychiatric disorder has been shown to cause occupational and social impairment with occasional decreases in work efficiency and intermittent periods of inability to perform occupational tasks; but the Veteran's over reporting of symptoms has prevented VA from concluding that his service connected psychiatric disorder has resulted in more severe symptomatology.


CONCLUSIONS OF LAW

1. The criteria for service connection for a bilateral eye disorder have not been met. 38 U.S.C. §§ 1101, 1110 (2012); 38 C.F.R. §§ 3.303, 3.304, 3.310, 4.150 (2017).

2. The criteria for service connection for a urinary condition to include the residuals of prostate cancer have not been met. 38 U.S.C. §§ 1101, 1110 (2012); 38 C.F.R. §§ 3.303, 3.304, 3.307, 3.309 (2017).

3. The criteria for service connection for erectile dysfunction have been met. 38 U.S.C. §§ 1101, 1110 (2012); 38 C.F.R. §§ 3.303, 3.304, 3.310 (2017).

4. The criteria for service connection for a jaw injury with loss of teeth for VA compensation purposes have not been met. 38 U.S.C. §§ 1101, 1110 (2012); 38 C.F.R. §§ 3.303, 3.304, 4.150 (2017).

5. The criteria for service connection for a disability of the colon have not been met. 38 U.S.C. §§ 1101, 1110 (2012); 38 C.F.R. §§ 3.303, 3.304, 3.310 (2017).

6. The criteria for a disability rating in excess of 30 percent for an acquired psychiatric disorder have not been met. 38 U.S.C. 1155 (2012); 38 C.F.R. § 4.150, Diagnostic Code 9411 (2017).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

Under applicable criteria, VA has certain notice and assistance obligations to claimants. See 38 U.S.C. §§ 5102, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a). In this case, required notice was provided, and neither the Veteran, nor his representative, has either alleged, or demonstrated, any prejudice with regard to the content or timing of VA's notices or other development. See Shinseki v. Sanders, 129 U.S. 1696 (2009). Thus, adjudication of his claim at this time is warranted.

As to VA's duty to assist, the Board finds that all necessary development has been accomplished, and, therefore, appellate review may proceed without prejudice to the Veteran. See Bernard v. Brown, 4 Vet. App. 384 (1993). Service treatment records, VA treatment records, and private treatment records have been obtained. The Veteran testified at a personal hearing before the Board, and a transcript of the hearing is of record. The Veteran was also provided with several VA examinations, and neither the Veteran nor his representative has objected to the adequacy of any of the examinations conducted during this appeal. See Sickels v. Shinseki, 643 F.3d, 1362, 1365-66 (Fed. Cir. 2011).

The Board notes that these matters were previously remanded in order to associate additional treatment records with the claims file and to provide the Veteran with additional VA examinations. Additional treatment records have been associated with the claims file, and additional VA examinations have been provided in substantial compliance with the Board's previous remand instructions. 

During the course of his appeal, the Veteran has alleged that he was exposed to radiation during the ammo dump explosion. The Veteran was provided with a form which could be used to obtain a dose estimate, but it does not appear to have ever been completed. Moreover, the Veteran through his statements and testimony has not provided any information to suggest that he had ever received any information suggesting that he was actually exposed to radiation. Without more information from the Veteran, the Board does not find a basis to order additional development.

As described, VA has satisfied its duties to notify and assist, and additional development efforts would serve no useful purpose. See Soyini v. Derwinski, 1 Vet. App. 540, 546 (1991); Sabonis v. Brown, 6 Vet. App. 426, 430 (1994). There is no prejudice to the Veteran in adjudicating this appeal, because VA's duties to notify and assist have been met.


Service Connection

In seeking VA disability compensation, a Veteran generally seeks to establish that a current disability results from disease or injury incurred in or aggravated by service. 38 U.S.C. § 1110. "Service connection" basically means that the facts, shown by evidence, establish that a particular injury or disease resulting in disability was incurred coincident with service in the Armed Forces, or if preexisting such service, was aggravated therein. 38 C.F.R. § 3.303. Service connection can also be established through application of statutory presumptions, including for chronic diseases, like organic diseases of the nervous system, that become manifest to a compensable degree within one year of separation of service or when there is continuity of symptomology since separation of service. 38 C.F.R. §§ 3.307, 3.309. The Veteran is presumed to have been exposed to herbicide agents during his period of service in the Republic of Vietnam, and service connection can also be established for diseases associated with exposure to certain herbicide agents, like prostate cancer, that ever manifest to a compensable degree. Id. Service connection can also be granted service connection for diseases and disabilities that are proximately due to or aggravated by a previously service-connected disability. 38 C.F.R. § 3.310. Finally, service connection may be also be granted on a presumptive basis for exposure to ionizing radiation. 38 C.F.R. § 3.311.

Eyes

At issue is whether the Veteran is entitled to a bilateral eye disorder. The weight of the evidence indicates that the Veteran is not entitled to service connection for a bilateral eye condition.

The Veteran testified at a personal hearing before the Board in March 2016. The Veteran claimed that during a period of service he was in the vicinity of an explosion at an ammunition dump, and that debris struck his face, which he believes resulted in a disorder of the eyes, such as dry eyes. The Veteran also indicated that during his period of service he was fitted for glasses. The Veteran reported that he currently experiences dry eyes and vision problems. See Transcript.

Upon induction into the first period of service, the Veteran's eyes were evaluated as normal, and the Veteran had 20/20 near and distant vision in the right eye and 20/60 distant vision and 20/70 near vision in the left eye. In a survey of medical history provided contemporaneously with the induction examination, the Veteran reported a history of eye trouble and wearing glasses. The Veteran's service treatment records indicate that the Veteran sought treatment for eye conditions throughout the period on appeal. A June 1966 spectacle order form indicated that the Veteran was initially issued spectacles. In November 1967, a medical officer indicated that the Veteran's vision was 20/20 in one eye and 20/70 in the other. As a result, the Veteran was referred for a refraction. Upon separation from his honorable period of service, the Veteran's eyes were evaluated as normal, with vision was measured to 20/20 in the right eye and 20/100 in the left eye. In a survey of medical history provided contemporaneously with the separation examination, the Veteran reported a history of eye trouble and wearing glasses.

The Veteran underwent a VA ocular examination in November 1969. The Veteran's eyes were evaluated as within normal limits. The Veteran's vision was measured as 20/60-1 in the left eye and 20/20 in the right. The examiner also indicated that the Veteran had normal external structure; pupilar reflexes; fundus; and extraocular muscle function. Medias were clear, and the examiner noted an impression of amblyopia of the left eye.

The Veteran also underwent examinations in February 1970 and October 1971 during his dishonorable period of service which indicated that the Veteran's eyes were evaluated as normal. The February 1970 examination indicated that the Veteran manifested 20/20 vision in the right eye and 20/70 in the left eye. The October 1971 examination indicated that the Veteran had 20/70 distant vision and 20/20 near vision in the right eye and 20/20 distant and near vision in the left eye. In surveys of medical history provided contemporaneously with the separation examination, the Veteran reported a history of eye trouble and wearing glasses. 
The Veteran underwent a general VA examination in March 1983, but no eye condition was identified in either eye. 

The Veteran's treatment records indicate that he developed glaucoma as early as February 2009.

The Veteran underwent a VA examination in June 2017. The Veteran was diagnosed with primary open angle glaucoma in both eyes, cataracts in both eyes, and refractive amblyopia of the left eye dating back to December 1965. The Veteran's had 20/60 distance vision and 20/40 near vision in the right eye and 20/200 distance vision and 20/50 near vision in the left eye. The examiner further opined that it was less likely than not that the Veteran's glaucoma was related to a period of service, because the Veteran did not manifest scarring on the cornea or angle recession of either eye. The examiner conceded that the etiology of glaucoma is not entirely known, but that it is likely hereditary, as the Veteran's brother also has glaucoma. The examiner added that the Veteran's had mild age related cataracts in both eyes, that appeared to be naturally occurring due the Veteran's age of 71, as they were first diagnosed in 2012; the examiner concluded that it was therefore less likely than not that the Veteran's cataract were related to his service.
Finally, the examiner conceded that the Veteran's refractive amblyopia of the left eye was not related to a period of service. The examiner indicated that his visual acuity upon entering service was 20/60, and that the day of the examination his best corrected visual acuity was 20/50; and that any injury that the Veteran incurred did not aggravate his pre-existing vision problems.

The weight of the evidence indicates that the Veteran is not entitled to service connection for his eye disorders other than cataracts. The Veteran currently has multiple eye disorders, and the Veteran sustained an injury that could have affected his eyes during a period of service. Nevertheless, the weight of the evidence of record does not establish that the preexisting vision problems in the Veteran's left eye were aggravated by a period of service, a medical nexus between an in-service incurrence and eye conditions that manifested after separation from service, or that a chronic eye disability manifested within one year since separation of service or continuity of symptomology since separation of service. 

The Veteran's pre-existing vision problems of the left eye were not aggravated by a period of service. The Veteran entered a period of service with a preexisting vision problem of his left eye with a visual acuity of 20/60. During the pendency of the appeal, the Veteran manifested a vision problem of his left eye with a visual acuity of 20/50. As such, the evidence does not establish that the Veteran's vision problem of the left eye was aggravated by a period of service, because his vision in his left eye has been clinically assessed as better during the pendency of the appeal than before he entered service. Additionally, a June 2017 VA examiner opined that it was less likely than not that the Veteran's vision problem of the left eye was aggravated by a period of service.

A medical nexus has not been established between an in-service incurrence and a current eye disorder that manifested after a period of service, and no neurological or other chronic eye condition manifested within one year of separation of service; and continuity of symptomology since separation of service has not been established. The Veteran's eyes were evaluated as normal upon separation from service, and, although he reported a history of eye problems, the Veteran did not identify any eye problems other than his pre-existing vision problems. The Veteran underwent a VA examination in November 1969 which did not identify any eye conditions other than the refractive errors. The Veteran's eyes were evaluated as normal upon separation of service in 1970 and 1971, and a March 1983 VA examination did not identify any bilateral eye conditions. The Veteran's current eye conditions (other than his vision problems) did not manifest until decades after separation from service. Finally, a June 2017 VA examination indicated that it was less likely than not that the Veteran's current eye problems were medically linked to a period of service.

Additionally, the Board notes that the Veteran has claimed that he was exposed to ionizing radiation during a period of service, during the ammo dump explosion. However, the Veteran has not provided any actual evidence, beyond his statements, to suggest that he was actually exposed to radiation, or that radiation was actually present following that explosion. As such, the Board does not find any basis for further development of this issue.

As described, the Veteran's bilateral eye conditions have been identified by the pertinent treatment records and a VA examiner has provided opinions on the nature and etiology of these conditions. The examiner has not indicated that these conditions are radiation related, and the record does not otherwise suggest that the Veteran's current bilateral eye conditions are related to radiation exposure. 

As previously noted, the Veteran is presumed to have been exposed to herbicide agents during his period of service, but the Veteran's diagnosed eye conditions are not associated with exposure to herbicide agents; 38 C.F.R. §§ 3.307, 3.309; and the evidence of record does not otherwise suggest that the Veteran's eye conditions are related to exposure to herbicide agents.

Here, the weight of the probative evidence of record simply fails to demonstrate that the Veteran is entitled to service connection for a bilateral eye disorder. As such, entitlement to service connection for a bilateral eye disorder is denied.

Urinary Condition 

At issue is whether the Veteran is entitled to a urinary condition to include residuals of prostate cancer. At his hearing, the Veteran testified that ever since the explosion in service, he had experienced urinary problems, in that he could not go to the bathroom like a normal person.

However, service treatment records do not show any urinary condition, and there is not report of any urinary problems for a number of years after service. Likewise no medical opinion of record even suggests that the Veteran has a urinary condition as a result of either a service connected disability or his time in service, to include any exposures therein.

A July 2015 VA treatment records indicate that the Veteran underwent a prostatectomy. However, the biopsy showed that the condition was benign. As such, it is not shown that the Veteran has had prostate cancer. While there are several VA treatment records which contain the phrase "prostate cancer", a review of the records in their entirety make it clear that there was no malignancy removed from the prostate.

A July 2017 VA examination diagnosed the Veteran with stress urinary incontinence post-prostatectomy. VA previously conceded that the Veteran was exposed to herbicide agents during his period of service in the Republic of Vietnam during the Vietnam War. See December 2010 Rating Decision. However, he is not shown to have any disability of the prostate that is presumptively related to exposure to herbicide agents, as such, the urinary problems that might be secondary to a prostate condition cannot be service connected on that basis.

The evidence does show that the Veteran had a shell fragment wound, but a VA examiner, who considered the question, opined it is less likely than not that the Veteran's urinary conditions were due to his military service to include his shrapnel wound since his prostatectomy and bladder biopsy in 2014 showed no malignancy identified. Additionally, a CT scan did not show any injury to bladder, urinary tract or colon. 

While the Veteran is considered competent to report experiencing urinary problems, he lacks the medical training or expertise to be able to opine as to the cause of such a problem. See Jandreau v. Nicholson, 492 F. 3d 1372 (Fed. Cir. 2007) 

Therefore, service connection for urinary condition is denied.

Erectile Dysfunction

At issue is whether the Veteran is entitled to service connection for erectile dysfunction. VA treatment records as early as 2002 and thereafter indicate that the Veteran manifested impotence of psychogenic origin. Additionally, the Veteran has been prescribed medication for erectile dysfunction. As discussed below, the Veteran has been granted service connection for an acquired psychiatric disorder. As such, the weight of the evidence indicates that the Veteran manifested erectile dysfunction that was proximately due to his previously service-connected acquired psychiatric disorder. As this is a grant of the Veteran's full prayer of relief any failure to develop the Veteran's claim of radiation exposure is harmless error.

In assigning the rating for erectile dysfunction, consideration should be given to whether SMC is warranted. See 38 C.F.R. § 4.115b. 

Dental

At issue is whether the Veteran is entitled to service connection for the loss of his teeth for VA compensation purposes. The weight of the evidence indicates that the Veteran is not entitled to service connection for VA compensation purposes.

Under VA law, compensation is only available for certain types of dental and oral conditions, which are rated under 38 C.F.R. § 4.150, Diagnostic Codes 9900-9916. Diagnostic Code 9913 applies to dental service connection claims involving teeth. Compensation is only paid for loss of teeth due to loss of substance of the body of maxilla or mandible without loss of continuity (as a result of trauma) or disease such as osteomyelitis, and not the loss of alveolar process (the ridge on the surfaces of the upper (maxilla) and lower (mandible) jaws containing the tooth sockets) as a result of periodontal disease, since such loss is not considered disabling. 38 C.F.R. § 4.150, Diagnostic Code 9913, Note. Thus, to warrant compensation for a dental disability the evidence must show that a trauma has caused a loss of substance of the body of the maxilla or mandible resulting in a loss of teeth, or that disease (such as osteomyelitis, but not periodontal disease) has caused a loss of substance of the body of the maxilla or mandible resulting in a loss of teeth.

The Veteran testified at a personal hearing before the Board in March 2016 that he had survived an explosion in-service; which caused a jaw injury resulting in the loss of teeth. The Veteran specifically indicated that when he stood up after the explosion he spit out blood as well as several teeth. See Transcript. The Veteran made similar contentions in written statements during the pendency of the appeal.

The Veteran's separation examination from his first period of service indicated that teeth numbers 19 and 30 were missing from the Veteran's mouth. No teeth were shown to be missing from the Veteran's enlistment physical in 1965. Multiple dental caries were identified in November 1966, and the Veteran consistently denied tooth problems on surveys of medical histories completed from 1967 to 1971.

A November 1969 VA general examination noting gross dental defects indicated that the Veteran had grafting of the enamel of his teeth.

A March 1983 psychiatric treatment record noted that the Veteran had a recent sports injury involving trauma to several teeth.

A July 2000 VA treatment record indicated that the Veteran underwent a dental procedure effecting teeth numbers eight and nine.

The Veteran sought treatment again at the end of 2004, and a July 2005 VA treatment record indicates that the Veteran underwent extractions of teeth numbers seven through 11, repairs of teeth numbers two, five, and six, and dentures of the immediate maxillary.

A June 2015 VA treatment record indicates that the Veteran had upper dentures and poor dentition on his bottom teeth.

An April 2017 VA general dental note indicates that the Veteran had sought dental treatment, but the determination of his eligibility was pending at that time.

The Veteran underwent a VA dental examination in June 2017. The Veteran reported that in 1966 he sustained facial and dental trauma resulting in damage to teeth numbers 11-13. The Veteran also indicated in in the 1970s he fell to the floor and fractured a couple more teeth. Finally, the Veteran claimed that he had a number of teeth extracted in 2008. The examiner opined that some teeth were extracted due to trauma, but that there was no loss of substance of the maxilla or mandible due to the trauma. The examination did not diagnose the Veteran with any other dental or jaw condition.

The weight of the evidence indicates that the Veteran is not entitled service connection for a jaw injury with loss of teeth for VA compensation purposes. The Board notes that the Veteran has a current dental disorder, has provided competent reports of an in-service incurrence that is corroborated by his service treatment records, and has been provided a positive VA medical opinion suggesting that some of his lost teeth were due to trauma incurred in-service. As a matter of law however, the Board can only grant service connection for VA compensation purposes for missing teeth due to trauma resulting in loss of the mandible or maxilla or due to a disease such as osteomyelitis. As discussed above, the June 2017 VA examination indicates that the Veteran's loss of teeth was due to trauma rather than a disease such as osteomyelitis, and the Veteran does not other contend (and his service treatment records do not show) that he was diagnosed with a dental disease such as osteomyelitis. Unfortunately, the June 2017 VA examination makes clear that the Veteran's condition did not result in loss of substance of the mandible or maxilla, and, therefore, the Veteran is not entitled to service connection for his dental condition.

The Board notes that the Veteran has claimed that he sustained exposure to ionizing radiation and herbicide agents during a period of service, and that further development of any estimated radiation dosage will be conducted on remand. Further development of this claim would not impact this decision however, because the Board concedes that the Veteran's loss of teeth was etiologically related to the Veteran's period of service; but that due to the unique nature of dental claims service connection is still precluded. 

Here, the weight of the probative evidence of record simply fails to demonstrate that the Veteran's dental condition was due to a disease such as osteomyelitis or trauma resulting in loss of substance of the mandible or the maxilla. Therefore, the evidence in this case is not so evenly balanced so as to allow application of the benefit-of-the-doubt rule as required by law and VA regulations. 38 U.S.C. § 5107(b); 38 C.F.R. § 3.102. As such, entitlement to service connection for a jaw injury with loss of teeth for VA compensation purposes is denied.

The Board notes that claims for service connection for dental conditions for VA compensation purposes can give rise to claims for service connection for dental conditions for treatment purposes. In this case however, the Veteran's VA treatment records indicate that the Veteran has been previously provided treatment from VA for his dental conditions, and that, as of April 2017, the Veteran had a claim for eligibility to dental treatment pending before a VA medical center. As such, the Board does not have jurisdiction over such a claim, because it has not been subject to a notice of disagreement challenging a denial by an AOJ. Moreover, referral of the claim is not necessary at this time, because the claim appears to be already pending before an AOJ of competent jurisdiction at this time.

Acquired Psychiatric Disorder

The Veteran is seeking a rating in excess of 30 percent for an acquired psychiatric disorder. He first filed for service connection for an acquired psychiatric disorder in December 1982 which was initially denied. The Veteran filed to reopen his claim in July 2009, and, in August 2009, the RO reopened the Veteran claim, granted service connection, and assigned a disability rating of 30 percent effective the date the claim to reopen was received. The Veteran appealed his initial disability rating as well as the effective date of the grant of service connection. In November 2016, the Board denied the Veteran's claim for an earlier effective date, but the Veteran's claim for an increased disability rating remains on appeal.

Disability ratings are determined by applying a schedule of ratings that is based on average impairment of earning capacity. Separate diagnostic codes identify the various disabilities. 38 U.S.C. § 1155; 38 C.F.R., Part 4. Each disability must be viewed in relation to its history and the limitation of activity imposed by the disabling condition should be emphasized. 38 C.F.R. § 4.1. Examination reports are to be interpreted in light of the whole recorded history, and each disability must be considered from the point of view of the appellant working or seeking work. 38 C.F.R. § 4.2. Where there is a question as to which of two disability evaluations shall be applied, the higher evaluation is to be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating is to be assigned. 38 C.F.R. § 4.7.

Disability ratings for acquired psychiatric disorders are assigned pursuant to the General Rating Formula for Mental Disorders. Under the General Rating Formula for Mental Disorders, a disability rating of 30 percent is assigned when a mental disorder causes occupational and social impairment with occasional decreases in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). 38 C.F.R. § 4.130, General Rating Formula for Mental Disorders.

A disability rating of 50 percent is assigned when a mental disorder causes occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short-term and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; or difficulty in establishing and maintaining effective work and social relationships. 38 C.F.R. § 4.130, General Rating Formula for Mental Disorders.

A disability rating of 70 percent is assigned when a mental disorder causes occupational and social impairment with deficiencies in most areas such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work like setting); inability to establish and maintain effective relationships. 38 C.F.R. § 4.130, General Rating Formula for Mental Disorders.

A total disability rating is assigned when a mental disorder causes total occupational and social impairment due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. 38 C.F.R. § 4.130, General Rating Formula for Mental Disorders.

When determining the appropriate disability evaluation to assign, the Board's primary consideration is the Veteran's symptoms, but it must also make findings as to how those symptoms impact the Veteran's occupational and social impairment. Vazquez-Claudio v. Shinseki, 713 F.3d 112, 118 (Fed. Cir. 2013); Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). The Board need not find the presence of all, most, or even some, of the enumerated symptoms to award a specific rating, because the use of the term "such as" in the rating criteria demonstrates that the symptoms after that phrase are not intended to constitute an exhaustive list. See Mauerhan. Nevertheless, as all ratings in the general rating formula are also associated with objectively observable symptomatology and the plain language of the regulation makes it clear that the Veteran's impairment must be "due to" those symptoms, a veteran may only qualify for a given disability by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration. See Vazquez-Claudio.

The Veteran's treatment records show he has experienced psychiatric symptoms throughout the period on appeal including: depression; anxiety; and trouble sleeping. However, all three symptoms are consistent with a 30 percent rating.

The Veteran underwent a VA examination in July 2010 at which he reported having last worked in January 2010 at a grade school coaching sports, and that prior to that he had worked as a coach and groundskeeper at multiple schools over the previous 28 years. The Veteran noted that he still volunteered as a coach at his local church. The Veteran reported that he only sleeps at most three to four hours a night, and that he strangled his wife several times during his sleep. The Veteran indicated that he experiences paranoia around large groups of people. The Veteran also admitted to several acts of battery. The examiner made the following observations: casual dress; good eye contact, grooming, hygiene, and posture; hyperactive psychomotor activity; cooperative and pleasant manner; rapid and pressured speech and communication; clear, logical, linear, coherent, and goal directed thought processes; intrusive memories; appropriate behavior; no delusions or hallucinations; depressed mood with congruent affect; reported suicidal ideation; denial of homicidal ideation; good concentration, judgement, and insight; and intact remote and recent memory. The examiner opined that the Veteran manifested occupational impairment with occasional decreases in work efficiency or intermittent periods of inability to perform occupational tasks, and that the Veteran's social impairment led to self-isolation with tendency toward rage to the point of physical aggression.
 
The Veteran submitted a written statement in September 2010 in which he claimed that he had to leave his previous employment due to his acquired psychiatric disorder, and that he had recently been prescribed a higher dose of psychiatric prescriptions. 

The Veteran testified at a personal hearing in March 2016. The Veteran indicated that he manifested a number of psychiatric symptoms including: paranoia; trouble sleeping; hypervigilance; exaggerated startle response; anxiety in crowds; and aggression. See Transcript.

The Veteran underwent another VA examination in June 2017. The Veteran reported that he had been married to his current wife since 1980, and that there were eight kids in his house. The Veteran indicated that he regularly attended church and also volunteered as a deacon. The Veteran admitted that he tended to become violent and aggressive when angry. The examiner made the following observations: good grooming and hygiene; unremarkable posture and gait; good eye contact; moderate psychomotor agitation; rapid and occasionally aggressive rate of speech; prosody for speech within normal limits; high tangential speech; no evidence of delusion, hallucinations, homicidal ideation, or suicidal ideation; highly irritable mood; predominantly angry and aggressive affect; and intact gross cognition. In addition to an in-person, the Veteran also underwent forensic psychiatric testing. Based on the results of the forensic psychiatric testing, the examiner opined that the Veteran was exaggerating his symptomology, and that the examiner could not provide a further opinion regarding the severity of the Veteran's acquired psychiatric disorder without resorting to mere speculation.

The Veteran submitted an application for a total disability rating due to individual unemployability in December 2017 indicating that he had not been employed for the previous five years (since 2012), but the Veteran did not identify his acquired psychiatric disorder as one of his disabilities that was preventing him from working.

The weight of the evidence indicates that the Veteran is not entitled to a disability rating in excess of 30 percent. The Board notes that the record contains multiple lay reports of the Veteran's psychiatric symptoms as well as any resulting occupational and social impairment. However, when the Veteran was examined by VA in July 2010, the examiner concluded that based on the Veteran's reported psychiatric symptomatology, his PTSD was most commensurate with the criteria for a 30 percent rating. The Veteran was scheduled for a second examination in June 2017, but the psychometric testing that was administered, as well as observations during the examination, led the examiner to conclude that the Veteran was exaggerating his psychiatric symptomology. The accuracy of VA's assessment can only be as good as the information provided, and the Veteran's failure to accurately report his symptoms frustrates the process of rating his claim. 

Here, the examiner who examined the Veteran in 2010 found his psychiatric symptomatology were most analogous to a 30 percent rating, and the findings at the 2017 examination did nothing to show that an increased rating was warranted. 

The Board acknowledges that the Veteran did report some symptoms at the 2010 examination, such as suicidal ideation, which can be associated with ratings in excess of 30 percent. However, applicable case law dictates that it is not the symptom itself, but the magnitude of the symptom and how it impacts the Veteran's social and occupational functioning. See Vazquez-Claudio v. Shinseki, 713 F.3d 112, 118 (Fed. Cir. 2013). Moreover, the Veteran consistently denied suicidal ideation outside of the 2010 VA examination.

The July 2010 examination also indicated that the Veteran's social impairment led to self-isolation with tendency toward rage to the point of physical aggression. A disability rating of 30 percent, however, takes into consideration substantial social impairment. 

The Veteran's current disability rating of 30 percent anticipates symptoms that can be properly characterized as moderate. 

Here, the weight of the evidence of record simply fails to demonstrate that the Veteran is entitled to a disability rating in excess of 30 percent for an acquired psychiatric disorder. Therefore, an increased rating is denied.

Colon Condition

The Veteran contends that he is entitled to service connection for a colon condition. 

Service treatment reports do not show a diagnosis of a colon condition. VA treatment reports do not show recent treatment for a colon condition related to military service.

At his hearing, the Veteran suggested several etiologies for a colon condition including exposure to herbicide agents, exposure to radiation, and the ammo dump explosion. As noted, radiation exposure has not been established, and the Veteran has not been diagnosed with a colon disability that is presumptively associated with exposure to herbicide agents.

The Board remanded the Veteran's claim to obtain a medical opinion of record, unfortunately, the examiner opined it was less likely than not that the Veteran's colon condition was due to his military service to include as a result of his shrapnel wound, noting that a CT scan did not show any injury to bladder, urinary tract or colon. 



ORDER

Service connection for a bilateral eye disorder is denied.

Service connection for a urinary condition to include the residuals of prostate cancer is denied.

Service connection for a colon condition is denied.

Service connection for erectile dysfunction is granted.

Service connection for a jaw injury with loss of teeth for VA compensation purposes is denied.

A disability rating in excess of 30 percent for an acquired psychiatric disorder is denied.


REMAND

The Veteran contends that he is entitled to a disability rating in excess of 10 percent for scrotal crural dermatitis prior to July 14, 2017 and in excess of 60 percent thereafter. This matter was previously before the Board, but the Board found that remand was necessary; because the Veteran's skin disorder had increased in severity. The Veteran's treatment records including a treatment record from April 2015 indicated that the Veteran had been prescribed phototherapy to treat his skin condition, but it is unclear whether this should be considered to be systemic therapy. Additionally, the Veteran testified at a personal hearing before the Board in March 2016 indicating that he underwent radiation therapy for skin pigmentations. See Transcript. The Veteran was provided a VA examination in July 2017 which indicated that the Veteran had been prescribed topical corticosteroids to treat his skin disorder but nothing else in a twelve month period. As such, this matter must be remanded in order clarify whether the previously identified phototherapy constitutes systemic therapy and, if so, over what period of time this was required for the Veteran's condition. See McLendon.



Accordingly, the case is REMANDED for the following action:

1. Obtain a medical opinion of record to answer the following questions: 

a) Did the Veteran's skin condition or conditions require the use of systemic therapy (such as therapeutic doses of corticosteroids, immunosuppressive retinoid, psoralen with long-wave ultraviolet-A light (PUVA) or ultraviolet-B light (UVB) treatments or electron beam therapy) from July 2009 to present? Why or why not?

b) If yes, how often was systemic therapy required (i.e. less than six weeks in a 12 month period; greater than six weeks but not constantly in a 12 month period; constantly or near-constantly in a 12 month period)? 

c) What is the significance, if any, of the fact that the Veteran's treatment records indicate that the Veteran underwent phototherapy to treat his skin condition in 2015 (available in VBMS: Receipt Date: 10/15/2015; Document Type CAPRI)? Why?

2. Then, readjudicate the claims on appeal. If the benefit sought is not granted, provide the Veteran and his representative with a supplemental statement of the case and allow an appropriate opportunity to respond thereto before returning the case to the Board, if in order.

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C. §§ 5109B, 7112 (2012).



______________________________________________
MATTHEW W. BLACKWELDER
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs